Julius M. Hooper, et al. [1] v. Commissioner. Hooper v. Commissioner
Docket Nos. 34516-34518.
United States Tax Court
1953 Tax Ct. Memo LEXIS 129; 12 T.C.M. (CCH) 1017; T.C.M. (RIA) 53295; August 31, 1953
*129 1. Determination of fraud disapproved. 2. Determination of deficiencies on the increase in net worth method disapproved. 3. Taxable years 1942 to 1946, inclusive, barred by statute of limitations. 4. Recomputation directed as to years 1947, 1948 and 1949. Ralph B. Potts, Esq., 1702 Hoge Building, Seattle, Wash., for the petitioners. John H. Pigg, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion TIETJENS, Judge: These proceedings were consolidated for hearing and opinion. In Docket Numbers 34516 and 34517, the respondent determined separately against Julius M. Hooper and Margaret E. Hooper, respectively, an income tax deficiency of $1,149.84 plus an addition to the tax of the so-called 50 per cent fraud *130 penalty of $574.92 for the calendar year 1948. In Docket Number 34518, the respondent determined jointly against Julius M. and Margaret E. Hooper, husband and wife, income tax deficiencies plus addition to the taxes of the so-called 50 per cent fraud penalties in the amounts and for the calendar years, as follows: Year
Deficiency
50% Penalty
1942
$5,713.23
$2,856.62
1943
7,068.47
3,534.24
1944
1,932.59
966.30
1945
6,763.72
3,381.86
1946
4,374.62
2,187.31
1947
9,971.63
4,985.82
1949
7,922.86
3,961.43
The questions presented are (1) whether the petitioners filed false and fraudulent returns for each of the years 1942 to 1949, inclusive, (2) whether the respondent erred in his net worth method of computing the petitioners' taxable net income for each of the years involved, (3) whether the forgiveness feature of section 6 of the Current Tax Payment Act of 1943 is applicable in determining the petitioners' income tax liability for the years 1942 and 1943, and (4) whether the years 1942 to 1946, inclusive, are barred by the statute of limitations, under section 275(a) and (c), Internal Revenue Code. Findings of Fact The petitioners Julius M. *131 and Margaret E. Hooper are husband and wife residing in Seattle, Washington. They filed timely joint income tax returns for the calendar years 1942 to 1947, inclusive, and for 1949 and filed timely separate income tax returns for the calendar year 1948, with the collector of internal revenue for the district of Washington. The deficiency notices covering all of the years involved herein were mailed on March 5, 1951, which was within 3 years of the filing of the returns for 1947, 1948 and 1949 and within 5 years of the filing of the returns for 1945 and 1946. Julius M. Hooper, hereinafter referred to as the petitioner, after attending 2 years of high school in Seattle, Washington, went to work at 16 years of age. Since then he has been steadily engaged in work, first as an employee and later on as self-employed. The petitioner at the age of 20 married his wife Margaret in 1908. They lived with his parents for 6 months and then for almost 3 years lived in a tent on a lot given the petitioner by his father. While living in the tent the petitioner performed most of the work in constructing a house on the lot. The petitioner and his wife moved into the house just before their daughter *132 was born in 1911. They also have a son born in 1922. From the time they were married the petitioner and his wife followed the practice of living economically and doing without many comforts in order to save regularly about half of the petitioner's earnings. They had little faith in banks and for many years kept their savings hidden in their home. In 1931 the petitioner secured a safe deposit box in the vault of the Fraternal Order of Eagles, of which he was a member, and thereafter kept a large portion of his savings in that safety box. The petitioner's first employment was as an office boy at the Old Seattle Electric Company, a street car company. He stayed with that company for 5 years and for the next 12 years worked in the shipping department of the Fobes Supply Company, a wholesale electrical supply house in Seattle. Thereafter he worked as a salesman for the A. G. Electric Manufacturing Company in Seattle for 1 1/2 years. In 1922 the petitioner purchased for $2,500 in cash a 50 per cent stock interest in the Rainier Electric Company, Inc. of Seattle, and went to work for that company. The other 50 per cent stock interest was owned by Pearl Putraw until sometime between 1926 *133 and 1928 when the petitioner purchased Putraw's remaining 50 per cent interest for an agreed price of $10,000 of which $5,000 was paid in cash and the balance evidenced by a note. Subsequently the note was paid off in full for $2,500 cash. The petitioner used a portion of his savings for his capital investment in Rainier Electric Company. For several years business was good and by 1933 the petitioner had recovered his capital investment. In 1933 Rainier Electric Company had little or no business and the petitioner made an assignment of his interest in that corporation to its creditors. During the first half of 1933 the petitioners started an electrical supply and contracting business in Seattle under the name of J. M. Hooper Electric Co., a sole proprietorship, and since then the operation of that business has been his principal occupation. At that time the petitioner had at least $12,000 in cash, a home at 4014-1st Avenue, N.E., Seattle, a car and several life insurance policies (about $13,000 face amount) some of which were subsequently dropped. In 1933 the petitioner had savings deposits in the Puget Sound Savings and Loan and also the Prudential Savings and Loan Association, *134 but prior to the time they were closed in 1933 the petitioner used those funds plus a $900 loan from the Seattle Mortgage Company to purchase a house and lot at Lake Forest Park, Seattle. The petitioner obtained the $900 loan in order to keep his safe deposit cash funds intact. In 1930 the petitioner's wife inherited from her father shares of stock in the Healy River Coal Corporation and since then has received regular dividends thereon. During the period from 1933 to 1941 and as general business conditions improved, the amount of the petitioner's business steadily increased, because he was well known in Seattle and obtained a good share of the available business. During those years the petitioner employed an inexperienced girl for office work and bookkeeping, a boy in the stockroom and journeyman wiremen varying in numbers from 1 to 5 depending on the amount of work he had on hand at any particular time. By the end of 1941 the petitioner's assets had increased greatly over what they had been when he strated his sole proprietorship business in 1933. A January 1942 financial statement filed with a Seattle bank disclosed a net worth of $12,489, including the assets and liabilities *135 of his business, his home and furniture, cars and trucks, other real estate, etc. The statement also disclosed a net profit of $3,573 from his business for 1941. In addition to the disclosures on that financial statement, the petitioner had other assets, which he considered purely his personal concern, including $26,000 cash in the safety deposit box, $2,500 cash kept at home, a 1940 DeSoto car worth $1,295, and $4,200 face value paid-up life insurance policies During the period from 1942 to 1949 the success of the petitioner's business varied considerably. In the war years he was unable to obtain help and his wife took care of the shop while he drove the truck to deliver materials and worked alone or with inexperienced help. The jobs he obtained were comparatively small except for one job at Pier 42, Port of Seattle. During those years the petitioner occasionally obtained loans from banks to cover bid checks rather than disturb his working capital or cash savings. When the petitioner's son and son-in-law returned home in 1945 from military service they both went to work for the petitioner with the idea of running the business, but they could not get along and that idea was abandoned. *136 In December 1946 the petitioner purchased the merchandise and some equipment of an electrical appliance store in Seattle for about $6,700, which was paid with cash withdrawn from his safety box and deposited in a bank for payment by check. Thereafter the appliance store was operated as a part of the petitioner's business. In March 1948 the petitioner employed a man especially to work on job layout plans and estimating. Thereafter the petitioner was able to submit bids on and obtain larger contract jobs. Throughout the 1940's the petitioner and his wife lived very economically. They owned their home, continued to use furniture acquired in earlier years and during those years their living expenses did not exceed $170 per month. The petitioner has had no training in keeping accounts or books. He was familiar with the system of bookkeeping used by Rainier Electric Company and he adopted that system and used it continuously throughout the years from 1933 to 1949. Consecutively numbered invoices were typed for all jobs performed or sales made showing the charges to the customer for materials, labor, overhead, etc. applicable to the job or sale and permit fee, if any, and the total amount *137 of the bill. The original invoice went to the customer as a bill. The carbon copy was retained as a record on which the petitioner made a notation as to his actual cost of material as shown by his purchase invoices from wholesalers and the actual labor costs as shown by his employees' time sheets plus permit fees, if any, and the total actual cost to the petitioner of the particular job or sale shown on the invoice. The difference between the amount billed to the customer and the actual cost represented the petitioner's gross profit or loss. Each invoice carbon copy was checkmarked to show that the amount due from the customer had been entered in an accounts receivable ledger and again checkmarket to show that the figures showing the gross sale, actual costs and gross profit or loss had been entered in a "Cost Book." Each page of the cost book contained the following columnar headings: "Total," "Merchandise," "Permits & Postage," "Labor," and "P & L." In the course of the petitioner's business the invoices were regularly entered in the cost book by their serial numbers and the customer's name. The amount due from the customer represented total sales and was entered in the total column. *138 The petitioner's actual cost of material was entered in the merchandise column. The permit fees and postage, if any, were entered in the permit and postage column. The petitioner's actual cost of labor was entered in the labor column. The difference between the figure in the total column and the sum of the figures in the remaining columns was entered in the P & L column as representing the petitioner's gross profit or loss on the particular job or sale. Throughout the years 1933 to 1949, inclusive and in the regular course of business, an invoice was made for every transaction and every invoice was entered in the petitioner's cost book, except for certain transactions in 1947, 1948 and 1949 with the Gilbert Brothers, Inc. and except for a postponement in sending a final invoice bill at the close of 1949 on a school district contract, as hereinafter set forth. The petitioner's various business expenses were paid by check and his check stubs and cancelled checks constituted his record of such expenditures. The petitioner also maintained opening and closing inventories of materials on hand at the beginning and ending of each year. Throughout the years 1933 to 1949, inclusive the petitioner *139 followed the practice of personally making out income tax returns for himself and his wife and, also, of making an honest effort to report correctly his gross income, deductions and net income for each year. In determining yearly gross sales the petitioner added up the 12 monthly totals of entries in the cost book under the column headed total, resulting in a figure representing the total amount billed to customers during the year. In determining expenses the petitioner went through his checkbook stubs for the year and took off in separate columns the amounts spent for materials, labor, salaries, rent, taxes, light, hauling, etc. and derived the totals for the various types of expenses incurred and paid. In his tax return for each of the years 1942 to 1949, inclusive the petitioner used the schedule "Profit (or Loss) From Business or Profession" for reporting the income from his business. On that schedule he reported total receipts, inventory at beginning of the year, merchandise bought for sale, labor, inventory at end of the year, net cost of goods sold, and gross profit and, also, other business deductions, including salaries, rent, taxes, depreciation and other claimed deductions *140 and the net profit. In reporting those various items the figures used by the petitioner were derived by him, to the best of his ability, from the records kept in the regular course of his business. None of the tax returns of the petitioner and his wife for the years 1942 to 1949, inclusive reported total sales in amounts less than total sales shown by the petitioner's "cost books" and none of those returns were false or fraudulent or made with the intent to evade tax. During each of the years 1942 to 1945, inclusive and 1947 the petitioner withdrew cash from his safety deposit box and purchased United States Series E Bonds as a patriotic duty and also, as a safe investment for a portion of his idle money. The petitioner held the bonds so purchased so that year by year there was an increase by several thousand dollars in the total amount of such bonds owned by him in the approximate following amounts: $1,125 in 1942; $4,950 in 1943; $7,200 in 1944; $10,950 in 1945 and 1946; and $14,100 in 1947, 1948 and 1949. During 1947, 1948 and 1949 Gilbert Brothers, Inc. with a main office in Portland, Oregon, and an office in Seattle was not a member of a certain jobbing association and for *141 that reason was unable to procure from wholesale suppliers the conduits and other electrical materials needed in its jobbing business. Purely as an accommodation and in his own firm name the petitioner made numerous purchases from wholesalers of electrical supplies for delivery at cost to Gilbert Brothers, Inc. The latter issued its checks payable to the petitioner or his company in the amount of the wholesale price and the petitioner deposited those checks to the account of J. M. Hooper Electric Company. In turn the petitioner issued his firm's checks to the wholesalers in payment for the supplies. On account of such purchases and deliveries the petitioner received from Gilbert Brothers, Inc. 6 checks totalling $146.23 in 1947, 11 checks totalling $10,643.39 in 1948, and 8 checks totalling $23,701.54 in 1949. The petitioner did not invoice any of those materials to Gilbert Brothers, Inc. and none of those transactions were entered in the petitioner's cost book record as a part of his gross sales. The petitioner did not regard those transactions as sales of merchandise in the course of his own business because there was no mark-up by the petitioner on the prices quoted by the wholesaler *142 when the materials were ordered. In not entering those transactions in his cost book record the petitioner overlooked the fact that while he received the quoted wholesale price from Gilbert Brothers, Inc. he usually paid the wholesaler a slightly lesser amount, mainly because of a small discount allowed by the wholesaler. The petitioner believed that any discounts so received were somehow reflected in his income. The amounts of those discounts were not included in gross income reported on the petitioner's returns for the years 1947, 1948 and 1949 but the petitioner was not aware of that fact until so advised by an accountant who made an audit of those years for the petitioner in the latter part of 1950. During part of 1948 and 1949 the petitioner was engaged on electrical construction work under a contract for the Lake Washington School District. On the basis of estimated partially completed work approved by the architect, the petitioner made up invoice bills which were entered in his cost book record. Those entries under the total column (representing ggross sales) were in the amounts of $4,926.36 in December 1948, $2,003.04 in April 1949, and $16,993.34 in October 1949. In each *143 instance the amount of the invoice equaled the cost of materials, labor and permits and disclosed no profit or loss. The work was completed by the end of 1949, but without the architect's final approval the petitioner was not able to compile his complete cost figures and his final invoice bill on that job was not made until after the first of the next year. The gross sales shown on the invoices on that job which were entered in the cost book were reflected on the petitioner's tax returns for 1948 and 1949. In preparing his 1949 tax return and in addition to gross sales shown in the cost book for that year, the petitioner included in gross income an amount of $30,000 as his best estimate of the amount due on the school district job. The petitioner had one cost book record which covered the period from December 1943 to November 1947. During 1948 in making work space at the shop for the newly employed estimator, bundles of old invoices, time sheets and records of the 1930's were thrown out and inadvertently some invoices of the 1940's were also destroyed. At that time the cost book for 1943 to 1947 disappeared and was presumed destroyed until accidentally uncovered in 1952. That record *144 was not available when internal revenue agents made an investigation of the petitioner's tax returns during 1950, but it was made available to them as soon as it was uncovered at a time prior to the trial in this proceeding. During the revenue agents' investigation of the petitioner's tax returns the petitioner and an accountant employed by him cooperated fully and made available all records and data on hand. The records included, inter alia, the cost book with entries covering December 1947, 1948 and 1949; accounts receivable ledger sheets for 1947, 1948 and 1949 and also, some of the accounts receivable ledger sheets for prior years; a great quantity of invoices; and the petitioner's bank records. From their examinations the agents found no reason to question the petitioner's gross sales figures and, to the extent the books were available, they did not find any instance of the petitioner's returns reporting less than shown by the books. The agents did not find any items of the petitioner's business omitted from the cost book for 1947 to 1949 except the Gilbert Brothers transaction in toto and the school district job in part as above set forth. Because of those two omissions from *145 the petitioner's records of gross sales and particularly because the petitioner's system of accounting did not lend itself readily to a check of the petitioner's cost figures as reported on his returns and, further, upon information as to the petitioner's bond purchases during the years 1942 to 1947, the agents resorted to the so-called increase in net worth method of determining the petitioner's net taxable income for the years 1942 to 1949, inclusive. A subsequent spot check by the revenue agents of the petitioner's cost book for 1943 to November 1947 against available invoices and other data disclosed that the petitioner's transactions were entered therein in the regular course of business during those years. In computing the petitioner's income on a net worth basis the respondent constructed a balance sheet of assets and liabilities for each of the years ended December 31, 1941 to 1949, inclusive. For the year ended December 31, 1941, the respondent included in assets, inter alia, $250 cash on hand and $1,798 on deposit in certain banks, accounts receivable as shown in a January 1942 financial statement to a bank, certain contracts receivable, merchandise inventory as per the *146 petitioner's tax return, certain stocks and utility bonds, business fixtures and tools, trucks and cars, and home and furnishings and, further, the respondent included in liabilities mainly certain items shown on the above mentioned January 1942 financial statement. For the following years the respondent made substantial year by year increases in many of the items mentioned, including bank deposits, but showed no other cash on hand except in the year 1949; also, he included additional items such as E Bond purchases. Some items remained unchanged for all years such as $2,375 for coal mine stock, $600 for utility bonds, $1,500 for shop furniture and fixtures, $1,000 for tools, $1,935 for automobiles, $4,000 for home furniture and fixtures and $3,300 for the home which latter figure was increased to $5,263 for 1949. From the constructed balance sheets the respondent determined for each year the increase in net worth over the preceding year and added thereto income taxes paid by the petitioner and estimated living expenses of $6,000 for each year. The result represented income as adjusted by the respondent for each year. The net income reported by the petitioner and his wife on their *147 joint returns for each of the years 1942 to 1947 and 1949, and on their separate returns for 1948 and the net income determined by the respondent was as follows: Net income
Net income
Year
reported
determined
1942
$3,214.72
$19,149.37
1943
3,284.99
20,773.54
1944
3,715.10
10,003.63
1945
3,630.33
20,145.18
1946
4,353.27
17,406.37
1947
4,371.74
27,902.22
1948
3,196.69
7,344.86
1948
3,196.70
7,344.86
1949
5,634.91
31,878.72
The net worth and the increase in net worth as determined by the respondent, for each of the years in question, are unrealistic and unreasonable in amount. The petitioner's books and records were complete and available for the years 1948 and 1949 when an audit was made by an accountant employed by the petitioner in the latter part of 1950. On the basis of adjustments the accountant deemed necessary and primarily to reflect the Gilbert Brothers, Inc. transactions and the Lake Washington School District contract, that audit disclosed amounts of unreported income of $2,560.34 for 1948 and $19,161.89 for 1949. At the time of that audit the petitioner's cost book recording gross sales for 1947 and prior years was still *148 missing and from the records on hand the accountant could only make estimates of the petitioner's gross sales, expenses and net income for the years 1942 to 1947. Opinion The issues presented herein are primarily questions of fact. We have concluded and found as a fact that none of the tax returns filed by the petitioner and his wife were false or fraudulent or made with the intent to evade tax. In our opinion the record conclusively supports such finding. While the missing cost book record for the years 1942 to 1947 handicapped the 1950 revenue agents' examination of the petitioner's returns, that book was available and was examined by the same agents prior to trial of this case. The agents found that the petitioner's tax returns did not report less gross sales than shown on his books and, further, they found no reason to doubt gross sales as shown by cost books with the exception of the omissions of the Gilbert Brothers, Inc. transactions and the Lake Washington School District contract. Those omissions have been fully explained to our satisfaction. Further, while the petitioner's records were not kept in accordance with the best approved accounting methods, they were sufficient. *149 The petitioner did keep records of his business transactions and he made an honest effort to report correctly his income. There being no fraud for any of the years involved herein, it follows that the years 1942, 1943 and 1944 are now barred by both the 3 year period of limitation under section 275(a) and the 5 year period of limitation under section 275(c), Internal Revenue Code. The question of the applicability of the forgiveness feature of section 6 of the Current Tax Payment Act of 1943, becomes moot. After the filing of the petitioner's returns for 1945 and 1946 the respondent mailed a deficiency notice within the 5 year period of limitation prescribed in section 275(c), providing for such period if the taxpayer has omitted from gross income an amount properly includible therein which is in excess of 25 per cent of the amount of gross income stated in the return for each of those years. The respondent contends that such is the case and relies upon his net worth method of computing income to establish the amounts of the omissions. We have found that the respondent's determination of increase in net worth is unreasonable and accordingly it is an improper *150 determination of the petitioner's net income for the years 1945 and 1946. Since there is no proof of omission of gross income in any amount from the petitioner's returns for 1945 and 1946, those years are now barred. We have found as a fact that the net worth and the increase in net worth as determined by the respondent, for each of the years in question, are unrealistic and unreasonable in amount. That finding is based upon a thorough consideration of the numerous exhibits and the testimony of all of the witnesses, including the revenue agents who made the examination of the petitioner's returns. The facts are sufficiently comprehensive and need no extensive review here. Briefly, the uncontradicted showing of record as to the petitioner's work and financial accumulations prior to 1942, as to his inability to expand his business during the war years because of lack of competent help, and as to his business growth in 1947 after acquiring an electrical appliance store and further growth after employing an estimator in 1948, all taken together, refute the respondent's computed increases in net worth for the entire period of 1942 to 1949, inclusive. Accordingly, the respondent's determination *151 for the taxable years 1947, 1948 and 1949 is disapproved. However, the record clearly discloses that the petitioner had additional unreported income in amounts not clearly ascertainable on the present record for the years 1948 and 1949 and possibly for the year 1947. The petitioner' books and records for those 3 years are available for a reaudit by the respondent and the petitioner. In this posture of the case we do not deem it appropriate to find that there are no deficiencies for those years. We conclude that the parties should be given the opportunity to stipulate in conjunction with a recomputation under Rule 50, or, to produce further evidence as to the correct net income and tax liability for the years 1947, 1948 and 1949, based upon the method of accounting regularly employed by the petitioner with appropriate adjustments for the Gilbert Brothers, Inc. transactions and the school district contract. If the parties are unable to stipulate those matters, these proceedings will be reopened as to those years on appropriate motion of either party. Thomas A. Talley, 20 T.C. - (No. 101). We conclude and so find that no part of any deficiency resulting from the recomputation pursuant *152 to this opinion for the years 1947, 1948 and 1949, is due to fraud with intent to evade tax. Accordingly, the 50 per cent addition to the amount of the deficiency, as provided in section 293(b), Internal Revenue Code, is not warranted in the instant case. Decisions will be entered under Rule 50. Footnotes
1. Proceedings of the following petitioners are consolidated herewith: Margaret E. Hooper, Docket No. 34517, and Julius M. Hooper and Margaret E. Hooper, husband and wife, Docket No. 34518.↩